vs. Manuel Trinidad-Acosta and 13-2056 United States v. Ed Cogswell. Mr. Zavaras, good morning. Good morning, Your Honor. May it please the Court, my name is Hunter Zavaras. I'm from Bangor, Maine, and I'm representing the appellant, Ed Cogswell, in this case. And if I could, Your Honor, can I reserve one minute for rebuttal time? Which appellant are you referring to? Cogswell? Yeah, Ed Cogswell. Yeah, thank you. Thank you. At the trials, at the trial of Mr. Cogswell, Your Honor, there was a lot of evidence that Mr. Cogswell was a customer or a user of crack cocaine. But there was very little evidence that Mr. Cogswell was actually in an agreement with anyone to distribute crack cocaine. Can I ask you right off the bat? Yes. Is he the one that was doing the deposits? No, Your Honor. Our position is that he never made any deposits. Now, if the jury did not agree with that argument and found that he did make the three deposits that were argued, at the most, Your Honor, that only indicates that he deposited money into the bank three times. The important part here is that... What was he depositing the money in? What kind of account? Well, he was allegedly, the money was being deposited into the boss of the conspiracy's account, Dolan Cabrera. But the interesting point, Your Honor, is that at trial, Mr. Cabrera made no indication or presented no evidence that he ever directed Mr. Cogswell to have him deposit any money in his account. Mr. Cabrera was quite detailed in his testimony about who did what in the conspiracy, how he controlled the account, and how he directed others to deposit money in the account, and he was absolutely silent about Mr. Cogswell. What was the government's evidence that he did the depositing? It was simply deposit slips that had Mr. Cogswell's name on it and a license number. And the other interesting point about this, Your Honor, is that the bank, the person from the bank who testified at trial, she testified that you don't need a photo ID to deposit money into these accounts, and there was evidence at trial that we presented that Mr. Cogswell had a slip from the court, basically saying that his license was being restored, had his name and license number on it. So it was our suggestion at trial that one of the other members of the conspiracy easily could have taken Mr. Cogswell's name and license number and used it for these deposit slips. And that was really the government's best evidence that they would have at trial that he was actually more than just a customer or a user. Well, what did the jury believe the government's evidence on his face? Even on his face, taking all of the government's evidence on his face still doesn't get to the point that Mr. Cogswell was in some sort of agreement to work in this conspiracy. Because take the deposit slips. The deposit slips would simply have been that Mr. Cogswell deposited money into the bank three times, but there's no link there from the owner of the accounts, from the boss of the conspiracy, saying that he did this for us as part of the conspiracy or that he knew what he was doing. There was more, though, wasn't there? I mean, the problem with this case is that maybe these little bits in isolation, but in totality he was living at the house, even though you say that the second floor was locked. There were witnesses who said that he was buying and reselling. Well, you've got the deposit slips. I mean, this court's always said, Your Honor, that just knowing of illegal activity or just being, even living where the illegal activity's being done isn't enough for the conspiracy. And I'm not sure if it's really all that much, Your Honor. I think what the evidence amount came down to was that the other co-conspirators were testifying that Mr. Cogswell was working with them, is the term they would use, or he was part of the conspiracy. But there was very little evidence, if any, saying about what he did or that he was selling to this person or that he was making this delivery for us. There wasn't any of that sort of evidence. So really, I think the evidence came down to just the fact that a number of co-conspirators repeated the term that Mr. Cogswell was working or part with them, but there really wasn't any sort of corroboration to back that up. Our case law says the allegation of even one, if the jury believes it, is sufficient. Typically, I think, Your Honor, in those cases, it's usually involving some sort of allegation that Mr. Cogswell sold to Bob Smith or something like that, or I saw someone came to the house and Mr. Cogswell made a transaction. I think there would have to be some sort of testimony, some sort of personal knowledge that they witnessed this or how they knew about it. In this case, there really isn't any of that from the co-conspirators. It's just Mr. Cogswell, he was part of it. Take our word for it. It's essentially what, when it comes down to the evidence, what the evidence was in this case. I don't remember. How long did he live in this crack house? According to the boss of the conspiracy, he testified that Mr. Cogswell and his girlfriend became homeless, so they let Mr. Cogswell and his girlfriend move into the house. And this was shortly before the conspiracy was seized, when the house was raided. How long did he live there? Do you have the record show? I think the judge found it sentencing. The trial record is kind of vague on that. The judge found it sentencing that it was sometime in the late summer or early fall. It doesn't tell me how long. Oh, sorry, Your Honor. It was August or September. The house was raided in November, two months, approximately two months. But, again, the evidence at trial was that where Mr. Cogswell and his girlfriend lived, and his girlfriend is not alleged to be a member of the conspiracy, but where they lived was on a separate floor from where the drugs and the money were kept. And all the testimony at trial was that the drugs and money were on this other floor that was locked, and there was no evidence that Mr. Cogswell would access that area or ever had access to that area. So I think that's another significant point when it comes to the evidence here. And what I started to say at the beginning, too, Your Honors, is that this whole idea that there's very little evidence of Mr. Cogswell involved in this conspiracy really runs through six of the seven arguments I present here, because it's not only to the sufficiency of the evidence. It goes to the misstatement by the prosecutor in closing argument that Mr. Cogswell had allegedly admitted to one of the agents that he had got cocaine for someone else, which just wasn't what the testimony was at trial. Could you address the obstruction enhancement? That's the one issue, Your Honor, I guess doesn't relate to the evidence, and I'm happy to address that, the evidence at trial, I mean. In that case, the judge, as you know, found that Mr. Cogswell had obstructed justice because after the trial he was awaiting sentencing, he sent a letter to another co-defendant named Jennifer Holmes. He sent a letter to her basically bad-mouthing and making a threat against another co-defendant who had already testified against him at trial. Well, and the government's theory is that that witness might have testified to the drug quantity at the sentencing, right? I think that's one of the government's theories. There doesn't seem to be any support of that on the record. But I think the more important- What did the pre-sentence report say about the source of the information about drug quantity? There was testimony at the trial about that. Right, and that's what the pre-sentence report relied on, was the testimony taken from the trial about the drug quantity. And that would have included the testimony of this witness who already testified, who was mentioned in the letter. But I think the heart of that argument, of our argument on the obstruction, is that the witness who Mr. Cogswell made the threatening comments about was never- well, he never received that letter, and that's clear. And there was no intent by Mr. Cogswell for that witness to ever receive the letter. Our argument was that Mr. Cogswell was essentially blowing off steam, maybe trying to sound cool by writing to this other co-defendant. And we submitted an affidavit from Mr. Cogswell that he did not intend, never expected the witness that he was threatening to receive the letter, and that he knew that these two co-defendants weren't friends or they weren't friendly, so it was unlikely that she would- and she was incarcerated, by the way, and she received the letter- unlikely that this information would ever get to the witness. And I think that distinguishes this situation from all the other cases where the obstruction enhancement's been applied, when there is either- most of the time it's used as a direct threat to someone, or it's a threat to someone that's close to the person, or done in circumstances where you expect that that person's going to learn of the threat. And typically it's-well, under the law, it's got to be done in a way to obstruct justice, to prevent the person from testifying, hear the person who testified. If Mr. Cogswell understood that his mail was being monitored, he must have understood that anyone incarcerated would have monitored mail, and that the institution would have an obligation to warn the person who's the subject of the threat. Well, Your Honor, I'm seeing my time's running out in a second, if I could just answer that question. The government suggested Mr. Cogswell knew that his mail was being monitored, but that's not-there wasn't anything in the record that Mr. Cogswell doesn't- So we don't agree with that factual assertion, Your Honor, that the government makes. Thank you. Thank you, Cogswell. Mr. Roth, good morning. Good morning, Your Honor. And you're one of the few people that pronounces my last name correctly the first time through. Let's hope you can do the same with me. Mr. Your Honor, Judge Torella. You just stick with Your Honor. For the record, my name is Attorney David Ruoff of the law firm Howard & Ruoff in Manchester, New Hampshire. This obviously is my first time appearing before this panel, so it's nice to meet you all. I only wish it was on a case that I did not attempt to waive oral argument, and I will address one issue that I briefed, which is the sentence imposed in this case. The crux of my argument with respect to the sentencing of my client, Mr. Trinidad Acosta, was that the trial court applied a disproportionate weight to three factors that he identified. The trial court parsed out three different things, and this is the appendix at page 161, I believe, to 162, that I believe the court considered three different things, but in my view it would really only be considered one thing. The trial court characterized my client's role in the conspiracy as a babysitter of drugs and money, as someone who was also a dealer who actually engaged in the sale and distribution of crack cocaine, and also that he had some role in the depositing of funds. The evidence at the trial was that the first and last of those two roles were very insignificant, and I think the sentencing judge treated them as kind of all the same level. The great weight of the evidence in this case is that my client was responsible for just kind of being the person that would bring the drugs to a transaction. He had no authority to deposit money on his own. He really just did what he was told. That was his role in this conspiracy. I describe him in my memorandum as someone who the higher-ups viewed as essentially disposable, someone who was important to them enough to make sure that he could go out in public and transact and deal with people that were buying the cocaine, but that if he ever got caught, it wasn't any blow to the conspiracy if he did. So that's why they would send him to the bank, a man that can't read or write English who would just give the deposit slips to the teller and probably didn't understand whose name he was using or whether or not, and there was no evidence that he knew who the fictitious account holder was. And I think that's what the judge considered most serious. He described it as a significant role when he went to the bank. There was not a lot of evidence at trial about how many times he did. Whether it was only him, there was evidence that sometimes he would go with someone that would help translate for him if he needed some translation services. So I actually, and I think the government characterizes my argument right, see that as kind of like a mitigating role. He was being used by these people that were higher up, people that he depended on completely to be able to function in this area, because he wasn't from there. He's from New York. He knew no one, and they just gave him his marching orders, and that's what he did. So that's why I would consider, you know, his role really is just a foot soldier, nothing more, nothing less. Well, he got a sentence that was five years below the range. Yes, he did, Your Honor. He received a sentence that was effectively a 20-year sentence. My argument is essentially that the judge should have, you know, considered the other factors in his life, his education, his illiteracy. You know, he's a Category 1 offender, and every time a Category 1 offender, the first felony conviction gets sentenced to in excess of 15 years, the court should look seriously at whether or not that sentence was reasonable. I will say in passing that I did mention in one portion of my brief a reference to the, you know, the other participants in the conspiracy and their relative sentences. However, our two clients, Mr. Acosta, Mr. Cogswell, were the only two in this conspiracy that actually went to trial. So I do not think that there is an apples-to-apples comparison, and that's why I didn't develop that argument in my brief. Unless there are any other questions, I rest on my brief. Thank you. Thank you. Good morning, Mr. Afram. Good morning, Seth Afram for the United States. Let me begin with Mr. Cogswell's sufficiency argument. The evidence in this case is multifaceted and overwhelming as it pertains to Mr. Cogswell. The evidence was that this conspiracy was a drug conspiracy bringing crack cocaine from New York to Bangor. It moved from multiple locations within Bangor during the life of the conspiracy. There was testimony that at each of the locations during the 15-month life of this conspiracy, Mr. Cogswell was one of the middlemen, one of the people in Bangor who was selling the drugs on the street. And, of course, that's an important role in a conspiracy like this, because the people from New York don't know the people in Bangor, don't know the people who want the drugs, and so local people with those connections are obviously important. So the evidence was from testimony that Mr. Cogswell was an everyday purchaser of crack cocaine in the amount of $400 to $800, more than personal use. The drugs were fronted to him. It's not logical to front drugs to someone who isn't going out to sell them to get them. If he's just using them, you wouldn't front them to the person. His name appears for the $400 to $800 quantities in drug ledgers. There are deposit slips of $26,000 with his name on them. His ID was found in the house next to business cards of the conspiracy called the Beer Factory. Now, the defendant wishes away each of those pieces and focuses on one snippet of testimony from Mr. Cabrera, the leader of the conspiracy. Mr. Cabrera was in New York. Mr. Cabrera did say that he knew Mr. Cogswell as someone who bought drugs for personal use. But Mr. Cogswell, I'm sorry, Mr. Cabrera was not the person present in Bangor. The people present in Bangor were the people that Mr. Cabrera had assigned to be there. Those people testified at the trial. Those people said Mr. Cogswell was a constant seller of the drugs throughout the life of the conspiracy. As my brief points out, this court's case law is clear that this kind of persistent seller, buyer from the conspiracy to sell downstream does make you part of the conspiracy. So as to the sufficiency argument, the jury was free to credit Mr. Cabrera, I suppose, if it wanted to, and say he was just a user. But it was obviously free to not accept that testimony. The jury was properly instructed on how to deal with cooperating witness testimony, how it should consider that with particular caution. Judge Woodcock told the jury that. They heard that. They decided to believe these witnesses because it was corroboration for these witnesses. So there was sufficient evidence to support this conviction. Let me turn to the obstruction question. Mr. Cogswell wrote a letter to Ms. Holmes. Ms. Holmes was a- My concern here is not so much that he didn't send the letter to the witness in the Brooks case. That's not so much my concern. My concern is this witness had already testified. There doesn't seem to be anything in the record to suggest that the witness was going to testify about the drug quantity at the sentencing hearing. So is- Yeah, I guess I understand your question. I would think that an important consideration here is this is an open- I mean, just because a jury's returned a verdict, this is an open case in multiple ways. My brief pointed out two. One, there is a potential sentencing hearing, and is there record evidence- well, there wouldn't be record evidence if he's not actually called, but it's- His pre-sentence report didn't contemplate that he would be called at the sentencing hearing, and this witness wasn't interviewed in connection with the pre-sentence report. All the evidence about drug quantity came from the trial. But that would be a government's decision. So, I mean, the way I would think this would play out is pre-sentence report takes the trial evidence, says, okay, the drug quantity is X. The government might say, no, it's Y. We disagree with that, and we're going to bring in Lewis and these other co-conspirators who are going to testify because we don't agree with how probation went about making its calculation. That could happen. But there's no evidence that that was likely to happen or was contemplated, right? I can't say that it was likely to be contemplated. I think that's always contemplated, that the government, when this letter is sent, is considering how is it going to handle sentencing. It needs to wait for the pre-sentence report and make a decision on whether it's going to make an evidentiary presentation. Sometimes it does. Sometimes it doesn't. I'd say the other point, though, is we're here today asking, is there going to be a retrial? Obviously, if you decide for any of these issues there's going to be a retrial, Mr. Lewis is a witness potentially at that retrial who's been threatened to be lynched. Yeah, but wouldn't there have to be some evidence that the witness was concerned about a possible retrial in making the threat? The obstructor? Yeah. Well, but the obstructor is interfering with whether he's doing it just because he's angry or whether he really, you're asking does he really have to believe that he's doing it to obstruct justice or that could just be the outcome of what he does? No, that the object has to be to obstruct, and in order for that to be an object, there has to be some contemplation on the part of the obstructor that there would be some evidentiary proceeding at which this witness might testify. And so it seems to me that when he perceives that there's a, he's involved in an ongoing criminal case, this person was an important witness against him. That case is not over. It has multiple phases in which it could still travel, and he threatens to kill that person. Then the question, that's certainly a natural outgrowth of what he's doing. I mean, one, it could just be spite and anger, but it's also equally important that it would obviously affect that person and make them less likely if called upon. And I think that the point of the obstruction guideline is to stop that kind of potential interference. It could be multiple. Well, the obstruction guideline doesn't talk about a situation where the witness has already testified. Is there any authority saying that an obstruction could occur because of the possibility that the witness who has already testified would be giving further testimony? Well, the guideline itself talks about not only obstructing the trial, but obstructing the sentencing. That's true. But is there any case that involves a situation where the witness has already testified and they're concerned about further testimony from that witness? I can't say that I can think of one that. I can think of more general ones where there's not even a trial yet, and they're sort of just the, we're going to go beat that guy up. We're mad that he cooperated. We're mad that he snitched. We're going to go beat him up. I don't know if I'm going to plead guilty yet. I don't know what I'm going to do, but we're going to go beat him up. And that's been held to be obstruction. It's not yet clear there's going to be a trial. Could be. Government could call Mr. Lewis at sentencing. Don't know if he is or not, but I'm going to threaten to kill him. Could have the benefit of making him not want to testify if the government asks him to. I think my reading of the cases as a whole is it doesn't, they don't, it's not as specifically nodded to the very pending, this person's very ready to testify, as opposed to he's a person cooperating with the government. We're going to go out and say things that might scare him or that we might actually do to him, whatever it is. And I think when you read the cases that I've cited as a whole, I think that's the flavor I got from them. And I think the guideline captures that by broadening out the kinds of proceedings. And I do think that Mr. Lewis remained a live potential witness in this case. That would be the government's call. Mr. Cogswell would have no way to know whether Mr. Lewis was going to come to sentencing or not. I mean, I don't think that that's made up in the sense that that really could happen. That is how a criminal case, I think, does unfold at the sentencing hearing, where the government reflects on the PSR and decides if it's going to go for more. And the way it goes for more is to bring in witnesses. And Mr. Lewis was one of the people who said, yes, the drugs were being dealt out of my house, and Mr. Cogswell was one of the people who came to me on a daily basis, and I was giving him this much amount of drugs. So in that sense, he was an important player in the quantity calculus. As far as the Brooks analysis goes, I mean, you say you're not concerned about that. I mean, the question there is whether it has to be sent directly to Mr. Lewis or is it enough that it's sent to Ms. Holmes. Now, Ms. Holmes is someone who's part of this conspiracy. She is one of the people involved. I think it's, you know, to say that he's just blowing off steam when he's, you know, if I send a letter to your friend or someone involved in your business, I think it's reasonable to think there's a high possibility that even if I'm just writing to the friend just to get off steam, that you're going to hear about it. I don't think that's a stretch to say. And the other point is you're right. I mean, the fact that Mr. Cogswell was in jail, is there specific evidence about jail being read? No. But I think Judge Woodcock in a sentencing hearing was sort of in a reasonable position to say, you were incarcerated and you knew your mail was being read, and that's a reasonable inference of other people's. You knew this letter would be read when you sent it to the incarcerated Ms. Holmes. As far as Mr. Ruoff's argument, you know, this is the classic kind of sentencing argument where he's taken the facts that the district judge thought were aggravating and reclassifies them as mitigating, and he does a nice job of doing that. Of course, the lesson of your sentencing jurisprudence is that's for the district court to do. The district court clearly articulated why it viewed those as aggravating factors. He came up from New York. He was here to watch the drugs. He was selling the drugs. He introduced a gun to the conspiracy. That's an important aggravating fact. He handled large quantities of money. What's the conspiracy about? It's about making money. You can say that they did that because he was dispensable. I suppose you can want to believe that. Or you can say they trusted him. This was a guy they were willing to put the money in his hands, and they didn't think he'd run away or take it, and it was gone. So that made him more important. That's simply a question of that's what district judges do. That's what they do every day. They look at the facts, and they decide what's mitigating and aggravating, and within wide bounds of reason, this court has upheld those. So those are the issues that have been talked about. If the court has questions on any of the others, I'd be happy to address them, but otherwise I'm happy to rest on the brief, Judge Tawaia. Thank you. We'll take a five-minute break. All rise. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you.